# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS M. GARCES | Civil No.   09-CV-01767-H (CAB) |
| Petitioner, | **ORDER** |
| vs. | **(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| JAMES A. YATES, Warden, et al., | **(2) DENYING CERTIFICATE OF APPEALABILITY** |
| Respondents. | |

On August 12, 2009, Luis M. Garces ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. §2254, challenging his conviction for first degree murder and assault with a deadly weapon on Confrontation Clause grounds. (Doc. No. 1 at 2.) Primarily, Petitioner contends that the forfeiture by wrongdoing doctrine does not bar his claim because Giles v. California, 554 U.S. 353 (2008) applies retroactively to his case.[1] (See Doc. No. 13-1 at 5, 6.)

On October 9, 2009, Petitioner filed his First Amended Petition. (Doc. No. 11.) The Court denied Respondent's motion to dismiss the First Amended Petition, (Doc. No. 16), and

---

[1] After Petitioner filed his habeas petition, the Ninth Circuit Court of Appeals held that Giles v. California does not apply retroactively to cases finalized before it was decided. Ponce v. Felker, 606 F.3d 596, 604 (9th Cir. 2010).

ordered Respondent to file an answer. (Doc. No. 20.) On June 16, 2010, Respondent filed an answer to the First Amended Petition. (Doc. No. 21.) Petitioner filed a traverse on September 2, 2010. (Doc. No. 25.) On February 25, 2010, the magistrate judge issued a Report and Recommendation that the Court deny Petitioner's First Amended Petition. (Doc. No. 26.) Petitioner responded with an Objection to the Report and Recommendation on May 2, 2011. (Doc. No. 29.) For the reasons set forth below, the Court **DENIES** Petitioner's First Amended Petition and adopts the Report and Recommendation.

## I.   PROCEDURAL HISTORY

On March 3, 2004, the San Diego County Superior Court convicted Petitioner of first degree murder and assault with a deadly weapon in connection with the stabbing death of his ex-girlfriend and the non-fatal stabbing of the decedent's friend. (See Lodg. No. 11, In re Garces, No. HC18685, Order (Cal. June 22, 2009).)

Post-trial, the Court denied a motion for new trial. Petitioner then appealed. Garces, 2006 WL 1553358, at *1. The California Court of Appeal affirmed with respect to the assault with a deadly weapon conviction. Id. at *27. However, it reversed the murder conviction, holding the Confrontation Clause barred prior statements made by the decedent to police officers. Id. at *14-26.

Respondent appealed, and, on August 23, 2006, the California Supreme Court granted a petition for review of the opinion below, but deferred action "pending consideration and disposition of People v. Giles, No. S129852." (Lodg. No. 4.) On May 23, 2007, the California Supreme Court decided People v. Giles, holding that the doctrine of forfeiture by wrongdoing is applicable outside of witness-tampering cases, so long as the "wrongdoing" is the same offense for which the defendant is on trial. People v. Giles, 40 Cal. 4th 833, 850-55 (2007), reversed by Giles v. Cal., 554 U.S. 353 (2008).

On July 11, 2007, the state supreme court remanded Petitioner's case to the Court of Appeal for reconsideration in light of People v. Giles. (Lodg. No. 5.) On December 17, 2007, the appellate court affirmed both convictions in their entirety. (Lodg. No. 6.) In so doing, the court reversed itself with respect to the murder conviction, concluding that under People v. Giles,

the forfeiture by wrongdoing doctrine applied and barred Petitioner from raising a Confrontation Clause claim. (Id.)

On January 11, 2008, the United States Supreme Court granted certiori in Giles. Giles v. Cal., 554 U.S. 353 (2008). Petitioner then filed a petition for review in state supreme court. (Pet.'s Opp., Ex. A.) The California Supreme Court denied the petition for review "without any prejudice to any relief to which defendant might be entitled after the United States Supreme Court decides Giles v. California." (Lodg. No. 8.) When Petitioner did not file a petition for writ of certiorari in the United States Supreme Court, the judgment against him became final on May 27, 2008, ninety days after the state supreme court's denial of review. See Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir. 1999).

On June 25, 2008, the United States Supreme Court reversed in part the California Supreme Court's decision in People v. Giles. Giles v. Cal., 554 U.S. 353 (2008). The United States Supreme Court held that the doctrine of forfeiture by wrongdoing applies only where the defendant engages in conduct "designed to prevent a witness from testifying," and only where the defendant acted with the intent of preventing the witness from testifying. Id. at 354. On February 9, 2009, Petitioner filed a motion to recall the remittitur requesting that his direct appeal be reinstated. (Lodg. No. 9.) The appellate court denied the motion on March 5, 2009, "without prejudice to the filing of a petition for writ of habeas corpus in the superior court." (Lodg. No. 10.)

Petitioner filed a habeas petition in the San Diego County Superior Court on April 27, 2009, arguing that his murder conviction should be reversed in light of Giles because there was no evidence that he killed the decedent with the intent of preventing her from testifying. (Lodg. No. 11.) The superior court denied relief on June 22, 2009, finding by a preponderance of the evidence that Petitioner had killed the decedent with the intent of preventing her from testifying. (Id.)

Petitioner then commenced this action by filing a federal habeas petition on August 12, 2009, followed by a First Amended Petition, filed on October 9, 2009. (Doc. Nos. 1, 11.)

## II.   FACTUAL BACKGROUND

The following facts are excerpted from the California Court of Appeal opinion in People v. Garces, No. D045022, 2006 WL 1553358, at *1-14 (Cal. Ct. App. June 8, 2006). This Court gives deference to state court findings of fact and presumes them to be correct. See 28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The relevant facts as found by the state appellate court are as follows:

> On December 4, 1997, at around noon, when Rachael Brooks responded to a knock on her front door on Madison Avenue in San Diego, she saw a woman, who appeared very distraught and fearful, and spoke only in Spanish. . . . When she turned to walk away, Brooks noticed a stab wound in her back. Brooks called 911 at 12:06 p.m., to report the incident at her neighbor's house . . . .
>
> San Diego Police officers and paramedics arrived within minutes. After the police briefly talked with Brooks and the wounded person, a transvestite named Rodolfo "Janet" Rodriguez (Janet), Janet was taken to the hospital for treatment and the officers entered the neighboring house on Madison Avenue. There, the officers discovered the body of Jorge "Yamile" Lee (Yamile), another transvestite, who had been stabbed several times in the hand, back, neck and chest . . . . [A] sock, which was turned inside out, [was] . . . found near the body on the living room floor. A large brown-handled butcher knife with blood smeared about four inches from its tip was found near the doorway leading from the dining room to the hallway to the bedroom.
>
> San Diego Police Officer Miguel Morales interviewed Janet at the hospital for about 10 minutes shortly after the knife attack and murder. . . . Janet, who was in pain and crying at the time, told Morales she had not known Yamile long and had just moved in with her. Yamile and her exboyfriend, named "Luis," had serious relationship problems and he had just gotten out of jail where he was in custody for violating a restraining order. The ex-boyfriend had called Yamile that morning asking for a ride, but she had refused and told him not to call again. Not expecting the ex-boyfriend to come to the house, Janet was surprised when she heard Yamile screaming, "you're killing me" from the next room and saw Yamile being assaulted by a man she recognized from photos as Luis, the ex-boyfriend. Janet rushed into the room and made eye contact with Luis as she fled the house, but he pursued and attacked her. . . .
>
> San Diego Police Detective Miguel Angel Penalosa joined Morales . . . and together with another officer, showed Janet a photographic lineup which included Garces's photo. Janet identified Garces from the lineup as the attacker. . . . Janet had spent the night before the attack with Yamile and had answered the phone that morning and had given it to Yamile when the man who identified himself as "Luis" asked for her. Janet overheard Yamile say something about a ride downtown, about someone owing him some money, and Yamile telling him to leave her alone. When she got off the phone, Yamile told Janet that her ex-husband was coming over to the house. Janet told Penalosa that a short time later

Garces, whom Janet recognized from the photographs in Yamile's albums, arrived at the house. Yamile introduced him as "Luis" and he asked Janet if she were living there. Janet told him "no," and when he and Yamile left the bedroom, Janet heard Yamile screaming, "You're killing me, you're killing me, leave her alone." When she walked to the doorway, Janet saw Garces stabbing Yamile with a large 10- to 12-inch kitchen knife which he then used to attack her. Janet struggled with him and then collapsed to the floor after he stabbed her. Luis stabbed Yamile again before leaving the house. . . .

During the subsequent investigation, it was determined that Garces had pled guilty November 26, 1997 to misdemeanor domestic violence (§ 273.5, subd. (a)) and making annoying phone calls (§ 653m), and had been released from jail on November 30, 1997. It was also learned that Garces had stayed at the home of his friends Reyna Rodriguez and her husband Saul Madrid the night before the attacks on Janet and Yamile. . . . The next morning Madrid left for work before 6:00 a.m. and Rodriguez left the home sometime between 10:00 a.m. and noon. . . . Garces was at the house when Rodriguez left and asked Rodriguez to leave the key to the house and the security gate with him. When Rodriguez returned home about one or two hours later, but no later than 12:30 p.m., Garces was outside, running up the stairs of the house, looking wet as if he had just fixed his hair. Appearing nervous, Garces said something horrible had happened, he had to leave and that if anyone asked her, Rodriguez should tell them he had gone to the store with her. He also told Rodriguez he had left some pants in the bathtub and she could either leave them or get rid of them. . . .

That evening when Madrid returned home from work, he found a pair of Garces's pants soaking in the bathtub with his own work clothing. . . . Subsequently, Rodriguez noticed that a 12-inch brown-handled kitchen knife was missing from her home. She believed that a picture of a knife found at the murder scene was her missing knife.

The autopsy showed Yamile had died from a four-inch deep stab wound to the back of the neck which had severed her subclavian artery and penetrated the top of her left lung. . . .

On September 30, 2002, Jorge Hechavarria, whose wife was Garces's sister, reported to the . . . Police Department near Miami, Florida, that he had overheard Garces . . . say on Thanksgiving Day of 2001 to another person, "I had a problem with my girlfriend in California and the blood ran.". . . Garces was subsequently arrested and brought back to San Diego for trial. A mistrial and new trial were ordered after the . . . jury was unable to reach unanimous verdicts. . . .

*Pertinent Procedural Matters*

During the in limine hearings for the retrial, the prosecutor advised the court that defense counsel objected to "[t]he portion of the telephone conversation as overheard by Janet . . . that Yamile could not take [Garces] downtown to pay his probation fine . . . . Yamile told [Garces] not to come over to the house and just leave [her] alone.". . . The court overruled the objection, stating it was not being offered for the truth but only as circumstantial evidence of identification, and offered to so instruct the jury.

*The Prosecution Case*

At the retrial, Brooks, Madrid, Rodriguez . . . and Hechevarria essentially testified as noted above. In addition . . . Yamile's mother, Gloria Fong, testified. . . . One of Fong's acquaintances had introduced Garces to Yamile and the friendship developed into a romantic relationship by August 1994. Garces began living with Yamile and Fong that same year.

Almost immediately, Fong became aware of violence in the relationship. Garces had a temper, was controlling, impulsive and jealous of Yamile, and took all her friends away. Garces disapproved of Yamile's friendships with other transvestites and tore up any papers containing telephone numbers of her friends. Garces and Yamile argued often and Fong sometimes heard blows, punching and loud angry words from the two. . . .

Fong remembered one incident around October 30, 1997, when Yamile was assaulted by Garces and talked to her about her injuries. . . .

Over defense objections, Fong was permitted to testify that on the day of Yamile's death, Fong had telephoned her around 10:15 a.m. Yamile told Fong "she was in a hurry, that she couldn't take care of [Fong] right now. She told [Fong] that Mr. Garces had [called on the phone and] asked her for a ride because he had to go pay some probation." Yamile also had told Fong "[t]hat she had to go get the car which was in the shop, and that she had to take a shower, wash her hair and pick me up at work, then she would take care of me later.". . .

Yamile's brother Lee testified he had called 911 in October 1997 when Yamile reappeared at home after being gone three days with injuries to her face below the right eye . . . . He also knew Garces had made threats to Yamile, even telling Lee, "[t]ell Yamile that if the clothes doesn't come up or appear again she can wait and see what's going to happen.". . .

Regarding the prior domestic violence incident on October 30, 1997, San Diego Police Officer Raphael Cimmarrusti responded to Lee's call on November 3, 1997. Going to the home, he spoke first with Lee and Fong, who were concerned about Yamile's safety after a fight with her ex-boyfriend Garces. Cimmarrusti then awoke Yamile and asked her about the incident. . . . Yamile appeared afraid and cried throughout the interview. She told Cimmarrusti she and Garces has had an argument because he was possessive and afraid she was seeing someone else. During the encounter, he had punched her with a closed fist three or four times and had pushed her into a wall as she tried to run away, causing pain in the left side of her ribs. He then had apologized and calmed down. . . . Over objection, Cimmarrusti related Yamile had explained that an individual in Cuba who made domestic violence complaints would have her hand cut off for retaliation if the police were involved. . . .

The next day, San Diego Police Detective Alex De Armas . . . was assigned to the domestic violence case involving Yamile. He called the home for Yamile and left a message with his name and telephone number. Yamile returned the call a few minutes later and De Armas conducted an interview with her. Yamile told him Garces's acts of violence against her on October 30, 1997, occurred because Garces was angry with the thought she was seeing another man. Garces also had

threatened to kill her, burn her house down or kill her family if she left him or reported the assault to the police. . . .

On November 8, 1997, De Armas had Garces arrested and brought to the station. . . .

The parties stipulated that Garces had pled guilty to misdemeanor offenses for domestic violence and making annoying telephone calls and that he had been released from jail four days before the stabbings.

Janet testified she . . . had spent the night at the Madison house in Yamile's room on December 3, 1997. . . . Then sometime between 11:00 a.m. and 12:00 p.m., Garces arrived at the home, opened the front door and walked in. Yamile introduced him to Janet as her "ex-husband." Janet left the room to go into the bathroom to put on her make-up. Yamile then came in and asked her if she could find some change so she could give it to her "ex" to take the bus.

As Janet sat on the bed in the bedroom looking for change in her fanny pack and Yamile looked for change in the chest of drawers, Garces came into the room with a medium-sized kitchen knife and attacked Janet. Janet tried to push Garces away and yelled at Yamile to call the police as Garces stabbed Janet on the right hand, left forearm, left breast and then in her back. Yamile pulled on Garces' arm and asked him why he was doing this. Before Janet lost consciousness, she was able to close the bedroom door. She also remembered seeing Yamile running down the hall with Garces pulling on her hair and thought she heard Yamile yell, "you're killing me, you're killing me, leave her alone." Janet did not see Garces stab Yamile.

When Janet regained consciousness, she opened the door, pulled herself up, crawled against the closet and down the hallway, where she saw Yamile laying in the living room. Yamile was still breathing, but did not move or talk. Janet thought Yamile was "delirious." Janet did not see Garces leave the house. In pain and bleeding, Janet then crawled to the house next door and knocked. The woman there called 911.

Janet did not remember anyone calling the house the morning of the stabbings. . . . Nor did she remember Yamile telling her that her ex-boyfriend or husband was coming over to the house. . . . She also did not remember telling the police she had seen Garces stab Yamile. Janet did remember being shown a photographic lineup at the hospital and picking Garces's photo as the person who had attacked her and Yamile. Janet identified Garces in court . . . .

On cross-examination, Janet conceded . . . [that she] did not remember whether she told an officer Garces had called asking Yamile for a ride that morning and Yamile had told him she would not give him one. Janet conceded that another man, the mechanic who was working on Yamile's car, had come to the house that morning, but said it was earlier and that the man did not come inside the house. . . .

*The Defense Case*

Garces did not testify. He presented a defense of mistaken identity and in the alternative, argued that the evidence at best proved the killing of Yamile was voluntary manslaughter due to his impulsive personality. Officer Morales was called to testify to the statements Janet had told him when he interviewed her at

the hospital after the stabbing. A defense investigator was also called who had met with Rodriguez to photograph her kitchen knives. Many of the knives had the same logo on them, but many did not. Some knives had black handles. Rodriguez had more than one knife missing from her set of knives since 1997.

An eyewitness identification expert further testified about eyewitness identification research, the acquisition and retention of information, problems of misidentification . . . .

A forensic scientist specializing in crime reconstruction testified some of Janet's statements to Officers Morales and Penalosa about where she and Yamile were attacked were inconsistent with the physical evidence. . . . The expert also disagreed with the prosecution's blood expert's testimony as to whether the stabber was left handed, used the sock to hold the knife, or inflicted the stab wounds on Yamile in a downward motion.

A psychologist specializing in clinical and forensic psychology, who had interviewed Garces and had performed various tests on him, testified Garces had a borderline personality disorder which resulted in unstable personal relationships. He also stated Garces suffered from "impulse control disorder," paranoia, neurological impairment which made it difficult to process information when Garces was emotional, and cultural issues such as "machismo" which caused Garces to be "very vigilant" about proving his sexual prowess. . . . The expert opined Garces exhibited abnormal or intense anger, which he had difficulty controlling, especially when he felt he was being disrespected or abandoned by a loved one.

Essentially, Garces attempted to show that Janet had made inconsistent and conflicting statements . . . and that her identification of him, whom she had never met, was suspect. He further pointed out that no physical evidence was found which placed him at the scene. Alternatively, he argued that if he were the person who had called for Yamile, and Janet had answered, then his coming to the residence and stabbing Yamile would only be voluntary manslaughter because of his jealousy, anger and lack of impulse control. . . .

*The New Trial Motion*

On May 25, 2004, Garces filed a motion for new trial based on *Crawford*, arguing the admission of Yamile's hearsay statements to Officers Cimmarrusti and De Armas without prior opportunity to cross-examine her violated his Sixth Amendment right to confrontation and deprived him of a fair trial. . . .

After hearing arguments of counsel, the trial judge reaffirmed his tentative [ruling], stating:

> "I think based on the *Crawford* analysis that we spread on the record, I think the statements were otherwise admissible under [Evidence Code section] 1370 or as spontaneous excited utterances. And I think there is the inherent reliability or trustworthiness that I referred to. And if there was error, *Crawford* error or otherwise, I think that it's harmless under the *Chapman* standard. So the motion for new trial is denied."

(Lodg. No. 6 at 6-27.)

## III. DISCUSSION

### A. Standard of Review

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

A federal court may not grant an application for writ of habeas corpus on behalf of a person in state custody with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v. Packer, 537 U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

"Clearly established [f]ederal law" refers to the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision. Lockyer v. Andrade, 538 U.S. 63 (2003). A state court's decision is "contrary to" clearly established federal law if: (1) it applies a rule that contradicts governing Supreme Court law; or (2) it "confronts a set of facts . . . materially indistinguishable from a decision of the Supreme Court but reaches a different result. See Early, 537 U.S. at 8; Williams, 529 U.S. at 405-06.

"Unreasonable application" requires the state court decision to be "objectively unreasonable, not just incorrect or erroneous." Lockyer, 538 U.S. at 65; Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); see also Clark v. Murphy, 331 F.3d 1062, 1068 (9th Cir. 2003), cert. denied 540 U.S. 968 (2003). More specifically, to establish an "unreasonable application" of clearly established Supreme Court precedent, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011).

A state court decision involves an "unreasonable application" of governing Supreme Court law if the state court: (1) identifies the correct governing Supreme Court law but unreasonably applies the law to the facts; or (2) unreasonably extends a legal principle from governing Supreme Court law to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. Williams, 529 U.S. at 407. Under this prong, a federal court may grant habeas relief "based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." Lockyer, 538 U.S. at 76; see also Woodford v. Visciotti, 537 U.S. at 24-26 (state court division "involves 'an unreasonable application' of clearly established federal law if it identifies the correct governing Supreme Court law but unreasonably applies the laws to the facts). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)); see, e.g., Moses v. Payne, 555 F.3d 742, 745 n.1 (9th Cir. 2009).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision. Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008). If the dispositive state court order does not "furnish a basis for its reasoning" because the state courts rejected a claim without comment, federal habeas courts must conduct an independent review of the record to determine whether the state courts' unexplained decisions were contrary to, or involved an unreasonable application of, "clearly established" governing Supreme Court law. See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848 (9th Cir. 2003).

"Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.

1  Early, 537 U.S. 3, 8 (2002).  What matters is whether the last reasoned decision reached by the
2  state court was contrary to Supreme Court law, not the intricacies of the analysis.  Hernandez
3  v. Small, 282 F.3d 1132, 1140 (9th Cir. 2002); see also Harrington, 131 S.Ct. at 784.  "[S]o long
4  as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court
5  precedent]," the state court decision will not be "contrary" to clearly established federal law.
6  Early, 537 U.S. 3, 8 (2002).

7  **B.  Confrontation Clause Claim**

8  Petitioner argues that the trial court violated his Sixth Amendment right to confront
9  adverse witnesses when it admitted through Officer Cimarrusti and Detective De Armas
10 statements made by Yamile regarding a prior domestic violence incident.  (Doc. No. 13-1 at 5.)
11 He contends that the United States Supreme Court's holding in Giles v. California, 554 U.S. 353
12 (2008) should be applied retroactively to this case.  (Doc. No. 13-1 at 5, 6.)  In the alternative,
13 Petitioner argues that the Court of Appeal's application of the forfeiture by wrongdoing
14 exception was an unreasonable application of clearly established federal law at the time of
15 appeal.  (Doc. No. 25 at 4-7.)  Respondent counters that because the Supreme Court's holding
16 in Giles is a new rule, under Teague v. Lane, 489 U.S. 288 (1989), it does not apply
17 retroactively.  (Doc. No. 21-1 at 15-20.)  Further, Respondent denies that the state court's
18 rejection of Petitioner's Confrontation Clause claim was contrary to or an unreasonable
19 application of Supreme Court precedent.  (Doc. No. 21-1 at 20-22.)  Finally, Respondent argues
20 that because the admission of Yamile's statements was not prejudicial error, under Brecht v.
21 Abramson, 507 U.S. 619 (1993), Petitioner's claim is not susceptible to habeas relief.  (Doc. No.
22 21-1 at 22-24.)  The Court considers each of the issues raised by the parties in turn.

23            1.     Retroactive Application of Giles

24 Petitioner argues that Giles, which cabins the application of the forfeiture exception to
25 cases of witness tampering,  see 554 U.S. at 366,  should be applied retroactively to his case.
26 However, Respondent's analysis is the correct one.  In Ponce v.Felker, 606 F.3d 596 (9th Cir.
27 2010), the Ninth Circuit explicitly held that Giles established a new rule that does not apply
28 retroactively to cases finalized before Giles was decided.  606 F.3d at 604.  Here, Petitioner did

1 | not file a petition for writ of certiori in the United States Supreme Court. (Doc. No. 13 at 4.)
2 | Consequently, his judgment became final on May 27, 2008, ninety days after the California
3 | Supreme Court denied his petition for review. See 28 U.S.C § 2244(d)(1)(A); Bowen v. Roe,
4 | 188 F.3d 1157, 1158-59 (9th Cir. 1999). Giles was decided on June 25, 2008, nearly one month
5 | after Petitioner's case became final. See 554 U.S. at 353. Accordingly, Giles does not apply
6 | retroactively to Petitioner's claim.

7 | Even if Giles were applicable to Petitioner's case however, his Confrontation Clause
8 | claim would still be barred by the forfeiture by wrongdoing doctrine. In overruling People v.
9 | Giles, 40 Cal. 833 (2007), the United States Supreme Court held that the forfeiture exception
10 | does not apply outside of the witness tampering context. See 554 U.S. at 359, 366 ("[T]he
11 | exception applied only when the defendant engaged in conduct *designed* to prevent the witness
12 | from testifying."). Therefore, for Giles to apply to Petitioner's case, this Court would have to
13 | presume that Petitioner did not engage in witness tampering. Yet, in denying Petitioner's state
14 | habeas petition, the San Diego Superior Court found that "Petitioner murdered the victim with
15 | the intent to render her unavailable to testify against him." (Doc. No. 1-2 at 152.) Because
16 | federal habeas courts must defer to state courts' findings of fact and presume them to be correct,
17 | 28 U.S.C. §2254(e)(1); Miller-El, 537 U.S. at 340, we do not disturb the superior court's
18 | finding. Accordingly, under Giles, Petitioner's claim would still be barred.

19 |                  2.       The Court of Appeal's Application of Pre-Giles Federal Law

20 | Petitioner argues that the Court of Appeal's rejection of his confrontation claim was
21 | contrary to or an unreasonable application of federal law. Specifically, Petitioner contends that
22 | at the time of his direct appeal, it was clearly established that the forfeiture exception only
23 | applied if it could be shown that defendant intended to kill the victim to prevent her from
24 | testifying. (Doc. No. 25 at 4-7.) However, before Giles was decided, "the scope of the forfeiture
25 | exception was 'an open question in [Supreme Court] jurisprudence." Ponce, 606 F.3d at 605
26 | (quoting Carey v. Musladin, 549 U.S. 70, 76 (2006)). Accordingly, the Court of Appeal could
27 | not have unreasonably applied federal law to Petitioner's case given that the question of whether
28 | and when the forfeiture exception applies was an open one at the time. Further, any error that

the Court of Appeal made in applying then-existing Federal law would have been harmless in view of the superior court's subsequent finding that Petitioner did manifest an intent to prevent the decedent from testifying. (Doc. No. 1-2 at 152.)

### 3. Prejudicial Error

Finally, Respondent argues that even if the state court erred in admitting the statements at issue, because they were non-prejudicial, Petitioner is not entitled to habeas relief. Despite Petitioner's contention that without Yamile's statements the government would not have been able to prove "malice, intent to kill, premeditation, identity, motive and violent character," (Lodgement 21 at 48), the Court agrees with Respondent that any error would be harmless. A violation of the Confrontation Clause is a trial error subject to harmless error analysis. See Slovik v. Yates, 556 F.3d 747, 755 (9th Cir. 2009). Thus, a petitioner is entitled to federal habeas relief only if the confrontation error has a "substantial and injurious effect or influence on determining the jury's verdict." Brecht, 507 U.S. at 619; accord Medina v. Horung, 372 F.3d 1120, 1125 (9th Cir. 2004). Here, the effect of Yamile's statements on the verdict was negligible because the jury had sufficient evidence to convict Petitioner of first degree murder without them.

First, Petitioner admitted to the crime when he said in front of his brother-in-law that "I had a problem with my girlfriend and the blood ran." (4 RT 375-83, 398-402.) Further, for each of the elements Petitioner argues could not have been proven absent Yamile's statements, the Court finds independently probative evidence. As to identity, Yamile's co-victim, Rodriguez, positively identified Petitioner in a photographic lineup the day after the crime. (7 RT 813-20.) As to motive, the prosecution presented evidence of Petitioner's possessiveness and jealousy regarding Yamile, (5 RT at 514-15), in addition to a prior threat against Yamile that came in through the testimony of her brother. (6 RT 545-48.) That Yamile was stabbed repeatedly in vital areas such that her lung was punctured, (2 RT 165(17), (48)-(50); 6 RT 577-88; 7 RT 739-84), evidences malice, or an intent to kill. There is also ample evidence of premeditation and planning. Petitioner brought the murder weapon with him to the crime scene, (3 RT 251-56; 4 RT 323-33, 414-29; 5 RT 460-62; 6 RT 609-24), and placed an inside-out sock over his hand

before stabbing Yamile. (2 RT 165(12)-(56), (79-80); 9 RT 1040-42; 3 RT 219-24; 2 RT 165(53).) Before the murder, Petitioner planned for its aftermath by obtaining the keys to a friend's apartment where he later washed himself and his clothing. (4 RT 323-27, 340-41, 411-24; 6 RT 609-21.) Finally, Petitioner's violent character could have been established absent Yamile's statements through, for instance, his November 1997 domestic violence conviction. (Doc. No. 1-1 at 147.)

In light of the sufficiency of the evidence against Petitioner independent of Yamile's statements to the officers, any error in admitting the statements was harmless and did not have a "substantial and injurious effect" on the verdict. See Brecht, 507 U.S. at 637. Accordingly, even if the Court of Appeal erred, Petitioner is not entitled to habeas relief.

**C.     Petitioner's Objection to the Report and Recommendation**

Petitioner argues that certain statements made at his second trial were inadmissible. (Doc. No. 29 at 1.) Specifically, Petitioner argues that the statements did not fall under the threat of infliction of injury or spontaneous statements hearsay exceptions recognized in California Evidence Code §1370 and §1240. (Id.)

The Court considers petitioner's objection and concludes that it is beyond the scope of habeas relief. Federal habeas review of state court decisions has customarily been limited to claims of constitutional violation. Herrera v. Collins, 506 U.S. 390, 416 (1993); see also 28 U.S.C. § 2254(d). Petitioner is not challenging the constitutionality of the admitted statements; instead, he argues that the state court misapplied the rules of evidence to them. (See Doc. No. 29 at 1,4.) However, the "habeas power . . . do[es] not allow [federal courts] to vacate a conviction based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling on the admissibility of evidence." Estelle v. McGuire, 502 U.S. 62, 67-8 (1991). Accordingly, Petitioner's claim is not cognizable to habeas review.

Even if the Court interpreted the Petitioner's Objection as alleging a Confrontation Clause violation in conformity with his other claim, Petitioner would still not be entitled to relief. Under Crawford, the Confrontation Clause bars only testimonial statements made by an unexaminable witness. See Crawford v. Washington, 541 U.S. 36, 50 (2004) ("not all hearsay

implicates the Sixth Amendment's core concern."). Testimonial statements are those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Parle v. Runnels, 387 F.3d 1030, 1037 (9th Cir. 2004) (internal quotation marks omitted) (quoting Crawford, 541 U.S. at 50). Here, Yamile's statements to Fong were by their nature non-testimonial because Yamile could not have reasonably anticipated that casual remarks to a family member would later be used as evidence against her killer. See Crawford, 541 U.S. at 51 ("[A] formal statement to government officers [is] testimony in a sense that . . . a casual remark to an acquaintance [is] not."). For the same reason, the telephone conversation between Yamile and Petitioner overheard by Rodriguez is likewise non-testimonial. See id. As to the threat against Yamile that Petitioner issued to Lee, this statement was made by Petitioner himself , and, therefore, the Confrontation Clause does not apply. See Vasquez v. Kirkland, 572 F.3d 1029, 1037 (9th Cir. 2009) (explaining that the admission of defendant's own prior statements does not implicate the Confrontation Clause.). Thus, the statements at issue were (1) non-testimonial within the meaning of Crawford or (2) made by Petitioner himself. Accordingly, their admission did not violate the Confrontation Clause.

### D.     Request for an Evidentiary Hearing

Petitioner is not entitled to an evidentiary hearing because his claim does not meet the requirements of 28 U.S.C. § 2254(e)(2). Giles was not "made retroactive to cases" finalized before it was decided. See 28 U.S.C. § 2254(e)(2)(i). Nor does Petitioner's claim "rely on a factual predicate that could not have been previously discovered through the exercise of due diligence." See 28 U.S.C.§ 2254(e)(2)(ii). Rather, his claim is premised on the state court's admission of facts already discovered. Finally, Petitioner's claim is not based on facts which "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable finder of fact would have found . . . [Petitioner] guilty of the underlying offense." See 28 U.S.C. § 2254(e)(2)(B). Accordingly, an evidentiary hearing is unwarranted.

## IV. CONCLUSION

For the reasons set forth above, the Court **DENIES** Petitioner's petition for writ of habeas corpus and adopts the Report and Recommendation. The Court also **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

DATED: June 9, 2011

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT